UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                    :

CEQUENT TRAILER PRODUCTS, INC.,  :        CASE NO. 1:05-CV-2566
                                    :

              Plaintiff,          :        JUDGMENT ENTRY AND
                                    :        OPINION INCLUDING
                                    :        FINDINGS OF FACT &
vs.                                :        CONCLUSIONS OF LAW
                                    :

INTRADIN (SHANGHAI)           :
MACHINERY CO., LTD.,           :
                                    :

              Defendant.        :
                                    :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

       The Court conducted a bench trial in this matter solely on the issue of damages.  The parties

presented evidence on December 1, 2006 and January 8 and 9, 2007.  During the course of the trial,

the Court received testimony, documentary evidence, stipulations, and physical exhibits.  The Court

now issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of

Civil Procedure.  These findings of fact and conclusions of law represent the Court's conclusions

after consideration of all of the evidence in light of the pertinent law, the Court's observation of the

witnesses, and its evaluation of their demeanor, qualifications, and credibility.

## I.  Background

       Plaintiff filed the complaint in this patent infringement action on November 1, 2005. [Doc.

1.]  The Court has jurisdiction in this case pursuant to 35 U.S.C. §§ 271 and 281 and 28 U.S.C. §§

Case No. 1:05-CV-2566
Gwin, J.

1331 and 1338(a). *Id.*

Plaintiff Cequent Trailer Products, Inc. ("Plaintiff" or "Cequent") is a Delaware corporation with its principal place of business in Wisconsin. *Id.* Cequent designs, manufactures, and markets trailer products and accessories. *Id.* Among its products, Cequent sells trailer couplers, jacks, and locks. *Id.*

Defendant Intradin (Shanghai) Machinery Co., Ltd. ("Defendant" or "Intradin") is a Chinese company with its principal place of business in Shanghai, China. *Id.* Intradin operates under the trade name "Towking" and advertises in the United States that it "manufactures the most complete line of quality towing accessories in China." [Docs. 94-10, 94-25.] Intradin sells, offers for sale, or imports its products to Ohio and solicits business in Ohio. [Doc. 15.] Intradin derives some revenue from goods sold in Ohio. *Id.*

This Court enjoys jurisdiction over Intradin under Ohio's long-arm statute found at Section 2307.382(A)(1) of the Ohio Revised Code: "(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's . . . [t]ransacting any business in this state". OHIO REV. C. ANN. § 2307.382(A)(1) (2006).

Cequent owns the right, title, and interest in and to four patents, including United States Patent No. 6,505,849, entitled "Ball Clamp Trailer Coupler" issued on January 14, 2003 ("'849 patent"); United States Patent No. 6,543,260, entitled "Receiver Lock" issued on April 8, 2003 ("'260 patent"); United States Patent No. 6,722,686, entitled "Coupler Locking Device and Method" issued on April 20, 2004 ("'686 patent"); and, United States Patent No. 6,874,764, entitled "Mechanical Screw Jack Having Stroke Limiting Nut" issued on April 5, 2005 ("'764 patent") (collectively with the '849 patent, '260 patent, and '686 patent, the "patents-in-suit.") [Doc. 1.]

-2-

Case No. 1:05-CV-2566
Gwin, J.

At some point, Cequent marked the patented products with the patent numbers for the corresponding valid and enforceable patents-in-suit. [Doc. 88.]

Cequent argues that Intradin cannot recover damages for Intradin's sale of patented products to certain companies.  On September 1, 2004, Cequent licensed the use of the '686 patent to Valley Industries LLC ("Valley Industries" or "Valley") at a royalty rate of $3.00 per unit for the first 10,000 coupler locking devices sold and a royalty rate of $2.75 per unit thereafter. [Doc. 88.]  On September 28, 2005, Cequent entered into a license and release agreement with Buyers Products Company ("Buyers Products" or "Buyers") that authorized Buyers Products to use the '849 patent to sell 8,064 ball clamp couplers at a royalty rate of $5.13 per unit for the first 6,126 units and $3.50 per unit for an additional 1,938 ball clamp couplers.  *Id.*  Intradin manufactured the coupler locking devices and ball clamp couplers for Valley Industries and Buyers Products. [Doc. 77, at 60-64.]

On November 1, 2005, Cequent sued Intradin. [Doc. 1.] While generally alleging Intradin's infringement in its Complaint, Cequent did not identify by stock-keeping unit number those of Intradin's products that allegedly infringed the patents-in-suit.  *Id.*  To its Complaint, Cequent attached several pages of Intradin's sales catalog, but did not specifically identify which products infringed which patents.  *Id.*

On February 28, 2006, the Court conducted a case management conference. [Doc. 22.] From that conference, the Court ordered Cequent to disclose by April 17, 2006, "each accused product that infringes the patent.  This identification shall be as specific as possible. Each product must be identified by name or model number, if known." [Doc. 23.]  Cequent filed no timely disclosure of alleged infringing products.

Instead, on July 17, 2006, Cequent finally identified Intradin's accused infringing products

-3-

Case No. 1:05-CV-2566
Gwin, J.

("Infringement Contentions"). [Doc. 94-17.]  With its Infringement Contentions, Cequent accused specific Intradin products of literally infringing the patents-in-suit.  *Id.*  This list included the following Intradin product numbers:

| Cequent Patent Number | Patent Description | Intradin Accused Infringing Product |
|---|---|---|
| '849 patent | Ball Clamp Coupler | 703017 |
| '260 patent | Receiver Lock | 708000, 708001, 708001C, 708002, 708002C, 708004, 708006, 705008, 708005, 705022 |
| '686 patent | Universal Coupler Lock | 708006 |
| '764 patent | Jack Having Stroke Limiting Nut | 701138, 701139 |

[Doc. 94-17.]

On July 17 and 28, 2006, and without amending its Complaint or Infringement Contentions, Cequent sought discovery of a substantially expanded body of Intradin products, including the following:

> each receiver lock, universal coupler lock, ball clamp coupler, and jack (1) identified in Intradin's catalogs; (2) depicted in the Exhibits to the Complaint; (3) identified by Intradin in the Intradin Sales Summary Sheet; and (4) any other receiver locks, universal coupler locks, ball clamp couplers, and jacks manufactured, offered for sale, sold, used, or imported by Intradin identical or substantially [sic, identical] to those depicted in Intradin's catalogs or the Complaint but having different model or part numbers.

*See, e.g.*, Doc. 31.

Intradin objected to Cequent's broadened definition of discoverable products and refused its discovery requests.  *Id.*

On August 25, 2006, and consistent with Cequent's Infringement Contentions, Intradin

Case No. 1:05-CV-2566
Gwin, J.

served its interrogatories on Cequent. *See, e.g.*, Doc. 31-5. Intradin requested Cequent to "identify

the claim alleged to be infringed and the product name and part number of the Intradin product that

Cequent asserts infringes that claim." *Id.*

On September 14, 2006, Cequent informed the Court of the parties' discovery dispute as to

Cequent's request for discovery on a broader range of products. [Doc. 28.] That same day, the Court

referred the parties' discovery dispute to Magistrate Judge Gallas. [Doc. 29.] On September 22,

2006, Judge Gallas narrowed the range of discoverable products to those

> involving each receiver lock, universal coupler lock, ball clamp coupler, and jack (1)
> depicted in the Exhibits to the Complaint; (2) identified by Intradin in the Intradin
> Sales Summary Sheet; and (3) any other receiver locks, universal coupler locks, ball
> clamp couplers, and jacks that are identical or substantially similar to those depicted
> in Intradin's catalogs or the Complaint but having different model or part numbers.

[Doc. 35.]

Judge Gallas also required both parties to identify the Intradin products by Product Numbers

that fell under his definition of "Products" subject to discovery. *Id.* On September 27, 2006 and in

accordance with Judge Gallas's Order, Intradin sent Cequent a letter identifying product numbers

subject to discovery. [Doc. 94, Exh. 20.] Cequent did not respond. Repeating, alleged infringer

Intradin sent the broadened list of discoverable materials to Plaintiff Cequent.

After significant discovery was initiated, Intradin represented that it would no longer contest

liability and agreed that Cequent should receive default judgment. *See, e.g.*, Doc. 47. On October

23, 2006, Cequent applied to the Clerk for entry of default, which the Clerk entered that same day.

[Docs. 50, 51.] On November 6, 2006, the Court granted Cequent's motion for default judgment.

[Doc. 57.] Upon entry of default judgment, the case proceeded to a damages hearing. [Docs. 57, 58.]

On December 1, 2006 and January 8 and 9, 2007, the parties presented evidence, including

Case No. 1:05-CV-2566
Gwin, J.

expert reports, on the issue of damages in a bench trial before the Court. [Docs. 77, 86, 87.]  At the

hearing, Cequent attempted to expand the universe of its Infringement Contentions by characterizing

Intradin's September 27, 2006 letter as an admission of infringing products. *Id.*

Intradin disagreed and sought to limit the universe of accused infringing products to those

listed on Cequent's Infringement Contentions. *Id.*  Intradin further stated that, while it infringed

Cequent's '764 patent, it never sold a Jack Having Stroke Limiting Nut.  *Id.*  Intradin also argued

that the Court should exclude Cequent's sales to Valley Industries and Buyers Products to avoid a

"double recovery" on those sales by Cequent.  *Id.*  Cequent's expert witness provided the Court with

some analysis of a hypothetical damages pool without the sales to Valley Industries and including

only "infringing sales" of ball clamp couplers to Buyers Products.  *See* Doc. 94-27.

At trial and in its post-trial briefing, Cequent presented evidence regarding a reasonable

royalty and did not attempt to prove actual damages in the form of lost profits.  *See, e.g.*, Docs. 77,

86, 87.  The Court accepts the parties' stipulation that Cequent is entitled to a reasonable royalty rate

of $1.00 per unit on sales of receiver locks that infringe the '260 patent.  *See, e.g.*, Doc. 88.  The

parties disagree on an appropriate royalty rate for all other of the infringing products.  *See, e.g.*,

Docs. 89, 92.  Intradin admits to selling 13,497 infringing receiver locks, 3,524 infringing ball clamp

couplers, and 7,328 infringing universal coupler locks.  *See, e.g.*, Doc. 89.

However, in its post-trial briefing, Intradin argues that most of its sales are not subject to

United States patent law because they are "F.O.B. China."  *See, e.g.*, Doc. 89.  Cequent contests

Intradin's "F.O.B. China" defense and seeks recovery on a much broader universe of products

because Intradin "admitted" to infringing all of products listed in its September 27, 2006 discovery

letter.  *See, e.g.*, Docs. 94-18, 94-27.

-6-

Case No. 1:05-CV-2566
Gwin, J.

## II.  Discussion and Legal Analysis

### A. Preliminary Matters

Before determining damages, the Court addresses Intradin's threshold issue of whether the alleged acts that constitute its infringement occurred within the United States.  Section 271(a) of Title 35 of the United States Code provides that "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term therefor, infringes the patent."  35 U.S.C. § 271(a) (2006).  Patent laws only apply within the United States and have no extraterritorial effect.  *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (1915) (citation omitted).

Intradin contends that it never sold or offered to sell any of the accused infringing products within the United States.  Intradin argues that did not consummate sale of the accused products to domestic companies, including Valley Industries and Buyers Products, in the United States.  Specifically, Intradin calls attention to the freight terms of "free on board" or "F.O.B." with a Chinese locale designated thereafter.[1]  From this, Intradin argues that the transfer of title of the accused infringing products from Intradin to the buyer actually occurred outside the United States.  Thus, Intradin argues, it did not "sell" into the United States and, as a result, is beyond the jurisdiction of the Court and United States' patent law.

Intradin's attempted "F.O.B. China" defense fails as matters of fact and law.  First, the record contains ample evidence that Intradin sold the accused infringing products in the United States.

---

[1] "'Free on board' is a method of shipment whereby goods are delivered at the designated location, usually a transportation depot, where legal title and thus risk of loss passes from seller to buyer." *N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1578 n.2 (Fed. Cir. 1994).

-7-

Case No. 1:05-CV-2566
Gwin, J.

Intradin admitted in its answer to Cequent's complaint that it "sells, offers for sale, or imports its products in Ohio and solicits business in Ohio.  Intradin admits it derives some revenue from goods sold in Ohio." [Doc. 15.]  Through its former counsel, Intradin admitted to "selling the allegedly infringing product in the U.S." [Doc. 44-2.]  Intradin invoices identify Cleveland, Ohio as a "F.O.B." sales location for products sold by it to Buyers Products. [Doc. 94, Exh. 15.]  The invoices also show Burnsville, Minnesota as a "Door to Door" sales location for the infringing products. [Doc. 94, Exh. 16.]  Other third party invoices show Intradin's sale of the accused infringing products to purchasers throughout the United States. [Doc. 94-25.]

Intradin's marketing efforts also resulted in offers for sale and sales of the accused infringing products in the United States.  Intradin distributed a product catalog to its customers in the United States that offered many of the infringing products. [Doc. 94-10.]  Since at least June 2004, Ronna Luo, a sales and marketing manager for Intradin, offered to sell and sold the accused infringing products to companies in the United States.  [Doc. 94-25.]  For example, on June 25, 2004, Luo sent an email to a Burnsville, Minnesota company offering Intradin product number 70800 receiver locks and 705008 ball clamp couplers for delivery "by UPS."  *See, e.g.*, Doc. 94-25, at 34. Further, the record clearly reveals that, in October and November 2005, Nick Ni, Intradin's Product Manager, offered to sell the accused infringing products at Las Vegas's Speciality Equipment Manufacturing Association trade show. *See, e.g.*, Docs. 10, 13, 14, 16, 44-3.  Thus, Intradin's admissions, invoices, and sales practices end any dispute of whether Intradin offered to sell and sold the accused infringing products in the United States.

Intradin's admissions, invoices, and sales practices conclude the legal question raised by its attempted "F.O.B. China" defense.  The Court also rejects the argument's merits.  Intradin's "F.O.B.

Case No. 1:05-CV-2566
Gwin, J.

China" argument addresses only the risk of loss in commercial transactions. It is clear that Intradin and its United States customers intended that Intradin ship the accused infringing products to them in this country. The F.O.B. freight terms merely went to when the risk of loss shifted during transport. For patent-law purposes, the risk of loss underlying a sales contract has little or no bearing on the situs of an allegedly infringing sale or offer to sell. *N. Am. Philips*, 35 F.3d at 1579 (holding that the sale of an allegedly infringing article occurred in the state where the buyer was located, although not necessarily only there, even if the F.O.B. freight terms indicated another location). The decisions cited by Intradin are distinguishable, as set forth in the footnote.[2/]

### B. Damages

#### 1. Reasonable Royalty

Section 284 of Title 35 of the United States Code governs the award of damages for patent infringement and provides: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284 (2006). A court calculates reasonable royalty damages by determining the pool of sales eligible for damages, determining the reasonable royalty rates, and multiplying the pool of sales eligible for damages by the reasonable royalty rates. *See, e.g., Georgia-Pacific Corp. v. U.S.*

---

[2/] *Shockley v. Arcan, Inc.*, 248 F.3d 1349 (Fed. Cir. 2001) did not address the relevance of "F.O.B." or similar designations relating to the risk of loss during shipment. *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1377 (Fed. Cir. 2005) concluded that "simply because an article is delivered "free on board" outside of the forum, a 'sale' is not necessarily precluded from occurring in the forum." *SEB, SA v. Montgomery Ward & Co., Inc.*, 412 F. Supp. 2d 336, 341 (S.D.N.Y. 2006) cites *MEMC* and *North American Philips* as support for its finding "that a product is sold F.O.B. China or F.O.B. United States, does not, by itself, determine where a product is sold for the purposes of § 271(a)." Comparatively, in *Cybiotronics Ltd. v. Golden Source Electronics, Ltd.*, 130 F. Supp. 2d 1152, 1173 (C.D. Cal. 2001), the court held that no sale took place in the United States in part due to the "F.O.B. Hong Kong" designation. Significantly, and unlike here, all the "essential activities" also took place in Hong Kong, i.e., sales negotiations, execution, performance, and actual delivery. In this case, Intradin sold into the United States' market and thus subjected itself to United States patent law.

Case No. 1:05-CV-2566
Gwin, J.

*Plywood Corp.*, 318 F. Supp. 1116, 1143 (S.D.N.Y. 1970). "The principle of patent damages is to return the patentee to the pecuniary position it would have been in but for the infringement." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1223 (Fed. Cir. 1995) (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)).

### a. The Pool of Sales Eligible for Recovery

Cequent says that it is entitled to damages on "all of Intradin's infringing products," including "sales of models identified in the complaint, the Infringement Contentions, and Intradin's September 27, 2006 discovery letter." [Doc. 92.] Cequent also says that it is entitled to damages on Intradin's sales of the accused infringing products to Valley Industries and Buyers Products, regardless of any payments that Cequent has already received from these companies. *Id.* Cequent contends that Intradin "admits to" and agrees with these outcomes by virtue of Intradin's default on the case during discovery.[3/] *See, e.g.*, Doc. 92, at 4 (citing *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004).

Intradin disagrees. It admits to infringing the patents-in-suit but says that the appropriate damages pool only includes its sales of those products identified by Cequent in its Infringement Contentions, less any sales to Valley Industries and Buyers Products. [Doc. 89.] Intradin argues that, because Cequent seeks to recover "reasonable royalties" for sales of its products into the United States and has already been paid such royalties by Valley Industries and Buyers Products, the Court

---

[3/] In its post-trial briefing, Cequent relies heavily on precedent from the Second Circuit as support for its proposition that "Intradin's default constitutes an admission of the well-pleaded allegations in Cequent's complaint." *See, e.g.*, Doc 92, at 4 (citing *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004). *See also id.*, at 15-16 (citing *Telequip Corp. v. The Change Exch.*, 5:01-CV-1748, 2006 U.S. Dist. LEXIS 61469, at *2 (N.D.N.Y. Aug. 15, 2006); *Segan Ltd. P'ship v. Treadmasters, Inc.*, 02-CV-3206, 2003 U.S. Dist. LEXIS 4467, at *2 (S.D.N.Y. March 25, 2003)). The Court notes that Cequent most likely erroneously assumes the sufficiency of its Complaint's pleadings to meet this legal standard. Further, while the Court respects its Sister Circuit's adoption of this legal construct, it is in no way obligated to follow it.

Case No. 1:05-CV-2566
Gwin, J.

should not award it a "double recovery" on those sales by including the units sold to Valley Industries and Buyers Products in the damages pool.  *See, e.g.*, Doc. 89.  Intradin says that it sold 13,497 infringing receiver locks; 3,524 infringing ball clamp couplers; and, 7,328 infringing universal coupler locks.  *Id.*  Finally, Intradin says that it sold an infringing jack having stroking limiting nut, but stopped doing so once it learned of the product infringement.  *Id.*

Intradin presents the better legal arguments and factual evidence on this issue.

First, the Court finds as unavailing Cequent's argument that the appropriate damage pool includes all of the products identified by Intradin in its September 27, 2006 discovery letter.  The letter in no way admitted that the expanded universe of "Products" infringed Cequent's patents-in-suit.  Instead, it represented Intradin's response to Magistrate Judge Gallas's Order that the parties expand their scope of discovery to include other potentially infringing products.  Notably, Cequent never responded to Judge Gallas's Order; nor did it ever seek to amend its July 2006 Infringement Contentions to include additional Intradin products to its list of accused infringing products. Cequent could have pursued either option prior to seeking default judgment, but it did not. Consequently, Cequent inappropriately and unpersuasively relies on Intradin's September 27, 2006, discovery letter and the entry of default judgment to expand its damages pool.

The Court also agrees with Intradin that the appropriate damage pool excludes sales of the accused infringing products by Cequent to Valley Industries and Buyers Products.  Cequent stipulates that it seeks to recover a reasonable royalty – and not lost profits – for Intradin's admitted infringement for the accused infringing products.  *See, e.g.*, Doc. 88.  Cequent licensed Valley Industries and Buyers Products to sell, manufacture, and import certain of its products.  In September 2004, Cequent entered into a "Patent License Agreement" with Valley Industries that

-11-

Case No. 1:05-CV-2566
Gwin, J.

gave Valley full rights to practice the '686 patent: "a nonexclusive, non-transferable license to use, make, sell, offer to sell, and import universal coupler locks." [Doc. 94-11.]  In exchange for the right to practice the '686 patent, Valley Products agreed to pay Cequent "a royalty of $3.00 per Licensed Product purchased, received or disposed of for the first 10,000 Licensed Products purchased, received, or disposed of in a calendar year" and $2.75 per unit thereafter.  *Id.*

Similarly, in September 2005, Cequent entered into a "License and Release" with Buyers Products regarding the '849 patent that gave Buyers has a non-exclusive license to sell 1,938 ball clamp couplers in its inventory in return for an agreed upon $3.50 royalty per coupler. [Doc. 94-12.] Cequent also to release Buyers from all liability for the "import and sale of Buyers' prior sold" 6,176 ball clamp couplers for a $5.13 royalty per coupler.  *Id.*  Buyers thus paid Cequent royalties for 8,064 ball clamp couplers.  However, Intradin sold Buyers 14,240 coupler units.  Thus, Cequent has not received royalty payments for 6,176 coupler units that Intradin sold to Buyers.

This case presents a somewhat unique fact situation in that Intradin, the admitted infringer, manufactures the licensed products for Valley Industries and Buyers Products. [Doc. 77, at 60-64.] Intradin then sells the universal coupler locks and ball clamp couplers to Valley and Buyers, respectively, who then pay their royalties to Cequent.  *Id.*  Thus, Intradin participates in the economic value chain despite its admitted status as an infringing manufacturer.  The law allows this arrangement under the calculation of a "reasonable royalty" and, further, does not allow the payment of a second, "double" payment of a royalty by Intradin to Cequent for the universal coupler locks and ball clamp couplers already compensated-for by Valley Industries and Buyers Products.

The law premises infringement damages on the need "to return the patentee to the pecuniary position it would have been in but for the infringement."  *Pall Corp.*, 66 F.3d. at 1223 (citation

Case No. 1:05-CV-2566
Gwin, J.

omitted).  The "reasonable royalty" calculation methodology pursued by Cequent entitles it to receive just remuneration for each of the universal coupler locks and ball clamp couplers produced by the infringing-Intradin.  Cequent receives "reasonable," negotiated royalties on these products from Valley Industries and Buyers Products.  To include these products in the damages pool would allow Cequent to "double-dip" its legally-permissible royalty recovery.

Finally, although Intradin admits that it has infringed the '764 patent, Doc. 88, it represents that it did not sell any of the Jacks Having Stroke Limiting Nut covered by the '764 patent.  The stroke limiting nut provided the principle patentable element of the '764 patent.  Cequent shows no evidence that the jacks sold by Intradin contained this element.  Without contrary or opposing evidence, the Court accepts as true the representations of Intradin on this point.

For the reasons discussed above, the Court limits its calculation of Cequent's damage recovery to those products that Cequent identified in its Infringement Allegations, which actually infringe, and for which Cequent has not yet received remuneration from Valley Industries or Buyers Products.  Thus, the pool of sales eligible for damages includes Intradin's admitted 13,497 infringing receiver locks; 3,524 infringing ball clamp couplers; 7,328 infringing universal coupler locks; and, 6,176 ball clamp couplers that Intradin sold to Buyers, but for which Buyers has not paid royalties.

*b.  Reasonable Royalty Rates*

"There are two methods by which damages may be calculated under [35 U.S.C. § 284].  If the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss.  If actual damages cannot be ascertained, then a reasonable royalty must be determined."  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works*,

-13-

Case No. 1:05-CV-2566
Gwin, J.

575 F.2d 1152, 1157 (6th Cir.1978)).  A reasonable royalty is not merely a means of calculating

damages, but is "the floor below which a damage award may not fall."  *Fromson v. Western Litho*

*Plate and Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988).

"The reasonable royalty may be based upon an established royalty, if there is one, or if not

upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and

a willing licensee." *Hanson*, 718 F.2d at 1078.  An established royalty, if proven to exist, is usually

the best measure of reasonable compensation for infringement.  *Hanson*, 718 F.2d at 1078 (quoting

*Tektronix, Inc. v. United States*, 213 Ct. Cl. 257, 552 F.2d 343, 347 (Ct. Cl. 1977)).

At the outset, the parties' stipulate that Cequent is entitled to a $1.00 per unit royalty rate on

sales of receiver locks that infringe the '260 patent. [Doc. 88.]  Further, the September 2004

agreement under which Plaintiff licensed the '686 patent to Valley Industries as licensee supports

the existence of an established royalty rate of $3.00 per universal coupler lock.  Similarly, the

September 2005 settlement agreement between Cequent and Buyers Products regarding the '849

patent supports the existence of an established royalty rate of $3.50 per ball clamp coupler.

In determining a reasonable royalty rate, courts frequently use the factors described in

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970),

*modified*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971).  The Federal Circuit has

approved these factors.  *SmithKline Diagnostics, Inc. v. Helena Labs., Corp.*, 926 F.2d 1161, 1168

(Fed. Cir. 1991).  The *Georgia-Pacific* factors include among others: rates paid for comparable

licenses, the patent holder's licensing policy, the commercial relationship between the parties, the

effect of selling the patented product on sales of other products, the profitability of the patented

-14-

Case No. 1:05-CV-2566
Gwin, J.

product, and opinion testimony from qualified experts. *See* 318 F. Supp. at 1120.[4]

Most frequently, royalties received by the patentee under prior and existing licenses for patented technology are the "most influential factor" in determining a reasonable royalty. *See, e.g.*, *Mobil Oil Corp. v. Amoco Chems. Corp.*, 915 F. Supp. 1333, 1353 (D. Del. 1994).

In this case, a number of the *Georgia-Pacific* factors do not apply to the instant facts.  No evidence was given regarding royalties paid by Intradin for other comparable patents; no evidence

---

[4]The *Georgia-Pacific* factors include:

1. Royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty;

2. Rates paid by the licensee for the use of other patents comparable to the patent-in-suit;

3. Nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4. Licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

5. Commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter;

6. Effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7. Duration of the patent and the term of the license;

8. Established profitability of the product made under the patent, its commercial success, and its current popularity;

9. Utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;

10. Nature of the patented invention, character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11. Extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12. Portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13. Portion of the realizable profit creditable to invention as distinguished from non-patented elements, manufacturing process, business risks, or significant features or improvements a by the infringer;

14. Opinion testimony of qualified experts; and,

15. Amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who would grant a license.

*Georgia-Pacific*, 318 F. Supp. at 1120.

-15-

Case No. 1:05-CV-2566
Gwin, J.

was offered on any effect of selling the patented product on related sales; no evidence showed any effect upon profit of persons using the patented product; and no evidence showed any standard royalty in the industry.  A number of the *Georgia-Pacific* factors suggest a lower royalty rate should apply: the license was non-exclusive and did not restrict others from selling the patented invention to the same customers; and Cequent had no complete policy against licensing the patented invention and had, in fact, previously licensed others to use the invention.  Several *Georgia-Pacific* factors suggest a somewhat higher royalty rate: Cequent and Intradin are direct competitors and the patents enjoyed long terms before their expiration.

Upon review of the terms of the agreements and upon the evidence and testimony presented at trial, the Court finds that the previous licensing charges used by Cequent best establish the royalties that would result in an arms-length negotiation and, as a result, best measure reasonable compensation for Intradin's infringement.

Therefore, upon review of all of the evidence submitted at trial, including the September 2004 Valley Industries licensing agreement and September 2005 Buyers Products settlement agreement, the testimony of Cequent's and Intradin's expert witnesses and the experts' reports the Court finds that Cequent has proven the existence of established royalty rates of $3.00 per universal coupler lock and $3.50 per ball clamp coupler.  The Court also finds these royalty rates are "reasonable," as required by the statute. *See* 35 U.S.C. § 284 (2006).

Applying the established reasonable royalty rates of $3.50 per universal coupler lock, $3.00 per ball clamp coupler, and $1.00 per receiver lock to the facts in this case yields a royalty revenue owing to Cequent of $69,431, exclusive of prejudgment interest.

*2.  Prejudgment Interest*

-16-

Case No. 1:05-CV-2566
Gwin, J.

In addition to a reasonable royalty amount, the Court may award Plaintiff "interest and costs." 35 U.S.C. § 284 (2006). "Prejudgment interest should ordinarily be awarded absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). "In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *Id.* at 655.

A patent owner is made whole by receiving prejudgment interest from the time that he would have received royalty payments, because "his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment." *Id.* at 655-56. Prejudgment interest is applied only to primary or actual damages and not to punitive or enhanced damages. *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed. Cir. 1983). Generally, a court awards prejudgment interest calculated from the date of the infringement to the date of judgment. *See, e.g.*, *Nickson Inds., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988). The rate of prejudgment interest and whether such interest should be compounded are matters within the Court's discretion. *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986).

Intradin does not oppose Cequent's request for prejudgment interest and the Court finds no reason to withhold such an award. In his reports submitted to the Court, Cequent's expert calculated prejudgment interest on total royalty revenue. *See, e.g.*, Docs. 94-18, 94-27. The expert's report does not discuss the basis or methodology of Cequent's calculation of prejudgment interest. *Id.* Therefore, the Court directs Cequent to calculate prejudgment interest on such royalties from September 2004 through the date of judgment in this action according to the rate and method of

-17-

Case No. 1:05-CV-2566
Gwin, J.

computation proposed by Plaintiff's expert and disclose the rate and method to the Court and

Intradin for final approval.

### C.  Willful Infringement

"The court may increase the damages up to three times the amount found to be assessed."

35 U.S.C. § 284 (2006).  While the statute does not prescribe a standard for applying treble damages,

> precedent establishes that a person having knowledge of an adverse patent has an
> affirmative duty to exercise due care to avoid infringement of a presumptively valid
> and enforceable patent.  The statute thus recognizes the tortious nature of patent
> infringement and the public interest in a stable patent right, for enhanced damages
> are not compensatory, but punitive.

*SRI Int'l v. Advanced Tech. Lab.*, 127 F.3d 1462, 1464 (Fed. Cir. 1997).

The question before the Court in determining willful infringement is "whether a prudent

person would have had sound reason to believe that the patent was not infringed or was invalid or

unenforceable, and would be so held if litigated." *Id.* at 1465.  "Whether infringement is willful is

a question of fact and must be established by clear and convincing evidence." *Comark Commc'ns,

Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed. Cir. 1998).

The Court analyzes the issue of willful infringement under the "totality of the

circumstances." *SRI Int'l*, 127 F.3d at 1465.  Factors considered by the Court include "the closeness

or complexity of the legal and factual questions presented" and "commercial factors that may have

affected the infringer's actions." *Id.*  In addition, the Court may consider mitigating factors such as

"whether there was independent invention or attempts to design around and avoid the patent or any

other factors tending to show good faith." *Id.*  "The law of willful infringement does not search for

minimally tolerable behavior, but requires prudent, and ethical, legal and commercial actions." *Id.*

Cequent has proven Intradin's willful infringement by clear and convincing evidence.  First,

Case No. 1:05-CV-2566
Gwin, J.

Cequent met its burden of establishing notice, a necessary element of willfulness.  To establish

notice, Cequent must prove by a preponderance of the evidence that it complied with the marking

statute.  35 U.S.C. § 287(a) (2006).  *See also Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437,

1446 (Fed. Cir. 1998).  A defendant's duty of care to avoid infringement attaches only after the

provision of actual notice.  *Id.* at 1446-47.  *See also Ortho Pharm. Corp. v. Smith*, 952 F.2d 936, 944

(Fed. Cir. 1992).

> The Court credits the testimony of Todd Walstrom, Cequent's Vice President of Engineering,

that the company follows a patent strategy of marking its products, or the packaging of its products,

soon after the granting of the patents-in-suit.  The Court also finds it credible that Cequent first

notified Intradin that it was infringing Cequent's products in September 2004.  Although Intradin

has denied receiving Cequent's September 2004 letter throughout this  litigation, evidence in the

case belies this denial.  Namely, on November 1, 2004, Nick Ni, Intradin's Product Manager, sent

an email to a United States customer indicating that a Intradin had received notice that a "Universal

Coupler Lock" sold by it "was filed into patent." [Doc. 94-25, at 37.]  Further, correspondence

between counsel for Cequent and Intradin repeatedly referenced the September 2004 letter.  Thus,

the Court is satisfied that Intradin had notice of Cequent's patents-in-suit and continued to infringe

them despite that notice.

> Second, the evidence strongly shows that Intradin deliberately copied Cequent's products.

Walstrom's unrebutted testimony established that Intradin took no care to avoid infringement of the

presumptively valid and enforceable patents. *SRI Int'l*, 127 F.3d at 1464.  For example, Walstrom

testified that Intradin's coupler lock is a "direct knockoff" of Cequent's patented products:

> > if you hold them side by side, but each and every aspect, if you look at the two locks
> > from every angle, are exactly the same.  The only difference is the color and the

Case No. 1:05-CV-2566
Gwin, J.

> decal on the front of the coupler.  Even the features that are nonfunctional, such as
> the back, the angles of the back, are identical.  The size and shape of the ball are
> identical.  The location of the pin to the ball is identical.  The front, the size and
> shape of this front, totally nonfunctional, just a plate on the front for branding, is
> exactly the same shape and size.  Everything about this lock is an exact knockoff.

[Doc. 77, at 30-31.]  Walstrom provided similar, unrebutted testimony as to Intradin's infringing

receiver locks, ball clamp couplers, and universal coupler locks.  *Id.*  Such flagrant infringement

does not reflect prudent, or ethical, legal and commercial behavior.  *SRI Int'l*, 127 F.3d at 1465.

Finally, Intradin did not undertake its "affirmative duty to exercise due care to avoid

infringement" of Cequent's products.  *Id.*  Instead, the company openly infringed Cequent's patents,

admitted to doing so, and defaulted in this law suit.

Under the totality of circumstances in this case, the Court concludes that Cequent has

presented clear and convincing evidence of Intradin's willful infringement.  Therefore, the Court

awards Cequent treble damages.  Tripling Cequent's royalty award of $69,431, produces an award

of $208,293, exclusive of prejudgment interest and attorneys' fees.

### D. Attorneys' Fees

"The Court in exceptional cases may award reasonable attorneys' fees to the prevailing

party."  35 U.S.C. § 285 (2006).  The party seeking attorneys' fees must prove by clear and

convincing evidence that the case is exceptional.  *Reactive Metals and Alloys Corp. v. ESM, Inc.*,

769 F.2d 1578, 1582 (Fed. Cir. 1985).  A district court generally may conclude that a case is

"exceptional" and award attorneys' fees for any of the reasons that it increased damages under

Section 234 of Title 35 of the United States Code.  *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1573 n.4

(Fed. Cir. 1996).  "Among the types of conduct which can form a basis for finding a case

exceptional are willful infringement, . . . misconduct during litigation, vexatious or unjustified

-20-

Case No. 1:05-CV-2566
Gwin, J.

litigation, and frivolous suit."  *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989).

Here, Cequent does not established by clear and convincing evidence that this is an exceptional case warranting an award of attorneys' fees.  The Court reaches this conclusion even after considering Intradin's willful infringement.  *See Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed. Cir. 1986) (holding that "[w]illfulness of infringement relates to the accused infringer's conduct in the marketplace.  Because that conduct may be seen as producing an unnecessary and outcome-certain law suit, it may make the case so exceptional as to warrant attorney fees under § 235").  However, a grant of willful damages, alone, does not entitle a party to attorney fees.  *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1567 (Fed. Cir.1988) (even where there is willful infringement, such a case does not necessarily constitute "exceptional circumstances").  An award of attorney's fees does not automatically follow from a finding of willful infringement.  *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir.1996) (recognizing that "a finding of willful infringement does not mandate that damages be increased or that attorneys fees be awarded") (citations omitted).  Rather, "willfulness is only one factor, albeit a sufficient one, for the court to examine in determining whether an award of attorney fees or costs is warranted." *Century Wrecker Corp. v. E.R. Buske Mfg. Co. Inc.*, 913 F. Supp. 1256, 1293 (N.D. Iowa 1996).

Several factors support Intradin's argument that Cequent fails to show exceptional circumstances sufficient to support an award of attorneys' fees.  With its answer, Intradin alleged that the patents-in-suit were invalid. [Doc. 15.]  After some, relatively minor discovery disputes, Intradin admitted infringement and withdrew its claim that Cequent's patents were invalid.

-21-

Case No. 1:05-CV-2566
Gwin, J.

Acknowledging liability, Intradin simply disputed Cequent's outsized damage claims. In claiming infringement damages for a huge array of products wholly beyond its Infringement Contentions, Cequent, not Intradin, made this litigation more vexatious and unjustified. *Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.*, 913 F. Supp. 1256, 1293 (N.D.Iowa,1996). With Intradin's admitted infringement, lack of challenge to Cequent's proposed claim construction, and lack of pursuit of any invalidity claims, the Court finds insufficient evidence of exceptional circumstances sufficient to warrant an award of attorneys fees.

### E. Cequent's Request for a Permanent Injunction

Lastly, Cequent requests that the Court "enter a permanent injunction enjoining Intradin from making, using, selling, offering for sale, or importing into the United States and of the Infringing Products." [Doc. 92.] Intradin does not oppose Cequent's request, but asks that the Court narrowly-tailor the remedy to include only those products identified by Cequent in its July 2006 Infringement Contentions. The Court will grant such relief and directs the parties to submit to it a joint proposed order for entry by the Court.

### III. Summary of Damages

| | |
|---|---|
| Total Reasonable Royalty | $69,431 |
| Triple the Amount of the Total Reasonable Royalty Based Upon Finding of Willful Infringement | $208,293 |
| Prejudgment Interest | Amount to be Determined <*> |
| Attorneys' Fees – Exceptional Case | $0 |
| | _____ |
| TOTAL AWARD | Amount to be Determined <*> |

<*> Plaintiff shall file application for prejudgment interest following the entry of judgment.

-22-

Case No. 1:05-CV-2566
Gwin, J.

IV.  Conclusion

Based upon the Court's findings of fact and conclusions of law, the Court **ORDERS** the Plaintiff shall recover from Defendant the amount of $208,293, exclusive of prejudgment interest.

The Court further **ORDERS** that Plaintiff shall recover prejudgment interest as provided for in the Court's findings of fact and opinions of law.  The Court further **ORDERS** that, within twenty-one (21) days of the filing of the judgment in this case, Plaintiff shall file an application for prejudgment interest, including disclosure of the interest rate and methodology of calculation.  If Defendant chooses to respond to Plaintiff's applications, Defendant shall file any such response within fourteen (14) days of service of such applications.

The Court further **DIRECTS** the parties to submit to it within twenty-one (21) days a joint proposed permanent injunction limited to those Intradin products listed in Cequent's July 2006 Infringement Contentions that infringe the patents-in-suit.

IT IS SO ORDERED.


Dated: February 7, 2007                                  s/          *James S. Gwin*
                                                        JAMES S. GWIN
                                                        UNITED STATES DISTRICT JUDGE

-23-